IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-114-D

| | | |
|---|---|---|
| JAMES M. GALLAGHER, as Trustee for and on behalf of National Packaging Solutions Group Trust, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| SOUTHERN SOURCE PACKAGING, LLC, | ) ) ) ) | |
| Defendant. | ) | |

On July 18, 2007, Magistrate Judge Webb issued a Memorandum and Recommendation ("M&R") recommending that the court deny defendant Southern Source Packaging, LLC's ("Southern Source") motion for summary judgment in this breach of contract action. The contract dispute concerns a deferred payment of $1.5 million in an asset purchase agreement. Plaintiffs James M. Gallagher ("Gallagher") and National Packaging Solutions Group ("NPSG") (collectively, "plaintiffs") claim that Southern Source owes the money, and Southern Source denies this claim. Southern Source timely objected to the M&R, and plaintiffs responded. In addition, plaintiffs moved for summary judgment, and Southern Source responded. On March 5, 2008, the court heard oral argument.

As discussed below, the court overrules Southern Source's objection, adopts the M&R, and denies Southern Source's motion for summary judgment. The court also denies plaintiffs' motion for summary judgment without prejudice. Nevertheless, because the court has serious doubts about Southern Source's alleged entitlement to avoid paying the $1.5 million to Gallagher and because those doubts revolve around Southern Source's alleged expert witness on damages, the court will

permit plaintiffs to file a motion to exclude Southern Source's expert report and testimony on damages and then to renew plaintiffs' motion for summary judgment.

I.

NPSG and Southern Source are packaging companies. See Am. Compl. ¶¶ 8, 30–33. On September 24, 2004, NPSG and Southern Source entered into a contract (the "Sale Agreement") wherein Southern Source agreed to purchase nearly all of NPSG's assets. For purposes of the present dispute, the Sale Agreement contained three important provisions. First, it contained a choice of law provision selecting Indiana law. See Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. A [D.E. 25-2], art. 18, ¶ I, p. 22. Second, it contained a deferred payment provision wherein Southern Source would pay NPSG $1.5 million on September 30, 2005. Id. at art. 3, ¶ B, p. 3.[1] Finally, it contained the following anti-assignment clause:

> [N]either party shall assign this Agreement or any rights under this Agreement to any person without the prior written consent of the other, which consent may be withheld by either party hereto in its respective sole discretion, except that Buyer may assign all rights and obligations under this Agreement to a limit [sic] partnership or limited liability company in which Buyer is a general partner or member. Any other attempted or purported assignment or transfer of this Agreement by a party without such consent of the other party shall be null and void.

Id. at art. 18, ¶ D, p. 21 [hereinafter "Anti-Assignment Clause"].

In December 2004, NPSG and its secured creditors created a trust for the benefit of NPSG's remaining secured creditors. See Am. Compl. ¶¶ 14–15. The sole purpose of the trust was to liquidate NPSG's assets. Id. ¶ 1. NPSG assigned its right to receive the $1.5 million deferred payment from Southern Source to the trust. Id. ¶ 14. Gallagher heads the trust. See id. ¶¶ 16–17.

---

[1] In relevant part, the deferred payment provision reads as follows: "Buyer shall pay One Million Five Hundred Thousand Dollars ($1,500,000.00) to the Sellers on the date that is twelve (12) months following the Closing Date, which amount shall be reduced dollar for dollar by . . . any Losses as defined in [Article] 13 [of the Sale Agreement] . . . ." Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. A [D.E. 25-2], art. 3, ¶ B, p. 3.

2

Thereafter, Southern Source claimed that NPSG had misled it and refused to pay the $1.5 million.

On March 10, 2006, Gallagher filed a breach of contract action to recover the $1.5 million. Southern Source responded, inter alia, that it need not pay Gallagher because the assignment to him was null and void under the Anti-Assignment Clause. See M&R 4 ("Defendant argues that Plaintiff Gallagher lacks standing to be named as a Plaintiff in this matter because Defendant did not provide consent to the assignment of the Sale Agreement to the Trust."). Southern Source also argued that because NPSG had made misrepresentations at the time of the sale concerning certain price increases that caused Southern Source to enter into the Sale Agreement and thereafter to incur losses, Southern Source was relieved of its obligation to pay the $1.5 million. See Am. Compl. ¶¶ 20–22; Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. A [D.E. 25-2], art. 3, ¶ B, p. 3 (providing that the $1.5 million payment "shall be reduced dollar for dollar" if Southern Source suffers certain enumerated losses).

On March 30, 2007, Southern Source moved for summary judgment and argued that the Anti-Assignment Clause barred Gallagher's claim. On June 8, 2007, the court referred defendant's motion for summary judgment to Judge Webb. See 28 U.S.C. § 636(b)(1).

On June 13, 2007, the court entered an order permitting Gallagher to amend his complaint to add NPSG as a plaintiff. On June 26, 2007, Gallagher filed an amended complaint, and NPSG was added as a plaintiff.

On July 18, 2007, Judge Webb issued an M&R concerning Southern Source's motion for summary judgment. Judge Webb concluded that NPSG's transfer was not void under the Anti-Assignment Clause because of Restatement (Second) of Contracts § 322 (1981). That section provides in relevant part: "A contract term prohibiting an assignment of rights under the contract, unless a different intention is manifested, . . . does not forbid assignment of a right to damages for

3

breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation...." Restatement (Second) of Contracts § 322(a)(2) (1981). Judge Webb concluded that NPSG's assignment to Gallagher of NPSG's right to receive the $1.5 million payment was either the assignment of "a right to damages" or the assignment of a right arising out of NPSG's "due performance of [the] entire obligation," and that the "null and void" provision in the final sentence of the Anti-Assignment Clause did not apply. See M&R 6 ("[T]here is no language in the Sale Agreement specifically forbidding assignment of a right arising out of due performance, or of the right to collect damages for breach."). Further, Judge Webb concluded that Southern Source could not avail itself of section 322(a)(2)'s language distinguishing times when "a different intention is manifested" because the Anti-Assignment Clause's "null and void" provision refers only to an assignment or transfer of "this Agreement." See id. Thus, Judge Webb recommended that the court deny Southern Source's motion for summary judgment.

II.

"The Federal Magistrates Act requires a district court to 'make a de novo determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (quoting 28 U.S.C. § 636(b)(1)) (emphasis removed). For those portions of the magistrate judge's report where no objection applies, "a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Id. (quotation omitted). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

The parties agree that Restatement (Second) of Contracts § 322 applies to their dispute about

the Anti-Assignment Clause, but disagree on how it applies. The court's research reveals no Indiana cases addressing Restatement (Second) of Contracts § 322. Nevertheless, Traicoff v. Digital Media, Inc., 439 F. Supp. 2d 872 (S.D. Ind. 2006), provides guidance. In Traicoff, the court could not locate any Indiana cases reflecting how Indiana would treat an anti-assignment clause prohibiting the assignment of "the contract." Id. at 879. In resolving the issue and predicting how the Indiana Supreme Court would resolve the issue, the court examined Restatement (Second) of Contracts § 322, the leading commentators, and Indiana's version of the Uniform Commercial Code ("UCC"). See id. at 879–80.

Because there are no Indiana cases on point, this court looks to the sources cited in Traicoff. First, the commentary to Restatement (Second) of Contracts § 322 notes that the two purposes of anti-assignment clauses are (1) to ensure that the counterparty receives personal performance from the would-be assignor where material, and (2) to protect the counterparty from the danger of double liability to both the would-be assignor and would-be assignee. See Restatement (Second) of Contracts § 322 cmt. a, b (1981). Second, Professor Corbin notes that anti-assignment clauses "must be clear and plain and should be strictly construed contra proferentem." 9 Arthur Linton Corbin et al., Corbin on Contracts § 873 (interim ed., rev. vol. 2002); see also Traicoff, 439 F. Supp. 2d at 879–80 (analyzing various contract law treatises, which advocate the same principle). Finally, Indiana's UCC provides that "[a] right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise." Ind. Code § 26-1-2-210(2).[2]

---

[2] Because the Sale Agreement does not involve a sale of goods, this UCC provision is not dispositive. Cf., e.g., Whitaker v. T.J. Snow Co., 151 F.3d 661, 665 (7th Cir. 1998) (using Indiana uniform commercial code for guidance and noting that "[a]rticle 2 of the UCC applies only to sales of goods").

5

Indiana courts would strictly construe the Anti-Assignment Clause to ensure that it serves only to protect the non-assigning party from losing material personal performance and from the danger of double liability. Here, as Judge Webb noted, the "null and void" provision of the Anti-Assignment Clause does not address whether the right to damages upon breach or the right to payment arising out of NPSG's due performance may be assigned. Cf. M&R 6 ("Although the provision mentions 'this Agreement'. . . , there is no language in the Sale Agreement specifically forbidding assignment of a right arising out of due performance or of the right to collect damages for breach."). Moreover, the policy rationales underlying anti-assignment clauses are not implicated. NPSG's personal performance is immaterial, and the recipient of the $1.5 million is fungible. Relatedly, there is no risk of double liability because NPSG has stated that payment is due only to Gallagher.

The Anti-Assignment Clause and Restatement (Second) of Contracts § 322 appear to doom Southern Source's argument that NPSG's transfer was void. Accordingly, Southern Source argues that the damages / due performance exceptions to anti-assignment clauses apply only when the rights being assigned have already vested because the contract is no longer executory. See Def.'s Obj. 1. Southern Source argues that the Sale Agreement was still executory because a second agreement called the Transitional Services Agreement ("TS Agreement") was still executory. See id. at 4–5. In making this argument, Southern Source contends that Indiana law treats contemporaneous agreements as one in the same, and argues that the TS Agreement is contemporaneous with the Sale Agreement and thereby still executory. Id. at 5–6. Thus, Southern Source contends that the damages / due performance exceptions do not apply because the right to payment which they represent had not vested. See id.

6

Case 5:06-cv-00114-D   Document 59   Filed 03/14/08   Page 6 of 14

Plaintiffs respond that Indiana law does not contain any vesting requirement for the damages / due performance exceptions. See Pls.' Resp. to Def.'s Obj. 4–6. Plaintiffs also contend that the TS Agreement is not contemporaneous with the Sale Agreement, because it was dated two weeks after the Sale Agreement. Id. at 3–4.

The court rejects Southern Source's attempt to construe the Restatement anti-assignment clause exceptions to include a vesting requirement. Under Indiana law, it is the Anti-Assignment Clause itself that must be strictly construed. Nothing in Indiana law supports reading a vesting requirement into the Restatement exceptions. Moreover, as explained earlier, the court agrees with Judge Webb that NPSG's transfer was not void under the Anti-Assignment Clause. Accordingly, Southern Source's motion for summary judgment is denied.[3]

III.

On July 30, 2007, plaintiffs filed a motion for summary judgment. Plaintiffs argue: (1) Southern Source was required to pay $1.5 million; (2) Southern Source did not pay; and (3) Southern Source has no justification for failing to pay. See Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. 9–12. Southern Source does not dispute that it did not pay, but argues that it was not required to pay the $1.5 million for various reasons. See Def.'s Am. Mem. in Opp'n to Pls.' Mot. for Summ. J. 9–21. Specifically, Southern Source contends that it need not pay the deferred $1.5 million, because Gallagher lacks standing due to the Anti-Assignment Clause. Id. at 10–12. Because the court has rejected this argument, the court will not address it further. Alternatively, Southern Source argues that it need not pay, because even if the assignment to Gallagher is not void, the assignment is nonetheless a material breach of the Sale Agreement. See id. at 12. Southern Source then argues

---

[3] In light of this conclusion, the court need not resolve the parties' argument about whether the TS Agreement is contemporaneous with the Sale Agreement.

7

that under Indiana's doctrine of first material breach, NPSG's breach was material and relieved Southern Source of any obligation to pay the $1.5 million. See id. at 12–14. Finally, Southern Source argues that it need not pay because NPSG made misrepresentations at the time of the sale concerning certain price increases that caused Southern Source to incur losses that offset the deferred payment on a "dollar for dollar" basis, thereby relieving Southern Source of its obligation to pay the $1.5 million. See id. at 16–17.

A.

The parties dispute who breached first and whether any breach was material. Plaintiffs argue that Southern Source breached when it failed to pay the $1.5 million when due. Southern Source responds that NPSG materially breached when it first assigned its right to receive the $1.5 million to Gallagher.

Under Indiana law, the elements of a breach of a contract claim are (1) a contract, (2) the other party's breach, and (3) damages. See, e.g., Rogier v. Am. Testing & Eng'g Corp., 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). Under the Indiana doctrine of first material breach, "[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." Licocci v. Cardinal Assocs., Inc., 492 N.E.2d 48, 52 (Ind. Ct. App. 1986). Where the doctrine of first material breach applies, the non-breaching party is relieved of any further contractual obligations. See Dreibelbiss Title Co., Inc. v. MorEquity, Inc., 861 N.E.2d 1218, 1220–21 (Ind. Ct. App. 2007) (lender was not required to give notice of foreclosure action to title insurer as required by contract because title insurer committed first material breach); Sallee v. Mason, 714 N.E.2d 757, 761–63 (Ind. Ct. App. 1999) (employer could not enforce covenant not to compete because employer committed first material breach by making accountant work hours beyond those specified in

8

contract); Licocci, 492 N.E.2d at 52–54 (employer could not enforce covenants not to compete because employer committed first material breach by failing to pay commissions when due); cf. Frazier v. Mellowitz, 804 N.E.2d 796, 803 (Ind. Ct. App. 2004) (noting that the breach must not only be material, but also must be incurable before the non-breaching party will be discharged from all contractual obligations). Therefore, summary judgment should be denied to plaintiffs if there is a genuine issue of material fact about whether the doctrine of first material breach applies.

For purposes of evaluating Southern Source's first material breach argument, the court will assume, without deciding, that plaintiffs breached the Sale Agreement when NPSG assigned the payment right to Gallagher. The question then becomes whether this alleged breach was material. Indiana courts look to the Restatement (Second) of Contracts to determine whether a breach is material. See Frazier, 804 N.E.2d at 802–04 (tracing Indiana materiality decisions in light of the two Restatements, and using the Restatement (Second) as the legal framework to determine materiality of breach). Restatement (Second) of Contracts § 241 (1981) states that materiality depends on the circumstances, and that five factors are significant: (1) the extent to which the injured party will be deprived of its reasonably-expected benefit; (2) the extent to which the injured party can be compensated for that deprivation; (3) the extent to which the nonperforming party will suffer a forfeiture; (4) the likelihood that the nonperforming party will cure; and (5) whether the nonperforming party acted in good faith.

Although materiality under Indiana law is sometimes a jury question,[4] no rational jury could conclude that NPSG's assignment of the payment right to Gallagher was a material breach. Southern

---

[4] See Innovative Piledriving Prods., LLC v. Unisto Oy, No. 1:04-CV-453-TS, 2006 WL 1843498, at *5–*6 (N.D. Ind. June 30, 2006) (unpublished) (denying summary judgment where first material breach doctrine was materially disputed); Columbus Reg'l Hosp. v. Patriot Med. Tech., Inc., No. IP 01-1404-C K/H, 2004 WL 392938, at *2–*3 (S.D. Ind. Feb. 11, 2004) (unpublished) (same).

9

Source argues that the breach was material because Southern Source needed to deal with the same NPSG officials who were involved in negotiating the Sale Agreement, and no one else. See Def.'s Am. Mem. in Opp'n to Pls.' Mot. for Summ. J. 15; Thomas Bennett Aff. ¶¶ 6–7 [D.E. 25-5] (noting that Southern Source wanted to work through any problems with someone who had intimate knowledge of the transaction, and that "negotiations with Mr. Gallagher were not productive" because he was not an original party and therefore lacked knowledge of the negotiations). In response, plaintiffs cite evidence that NPSG, the original seller, is merely a shell company with no remaining employees, and it thus would have been impossible for Southern Source to work with the NPSG personnel who negotiated the Sale Agreement instead of Gallagher. See Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. 9 n.5; Decl. of Kevin J. Lavin ¶ 7 [D.E. 27] ("The NPSG personnel who negotiated the Agreement are no longer employees of NPSG.").

At oral argument, Southern Source admitted that nowhere in either the Sale Agreement or the TS Agreement is there any language suggesting that Southern Source had a right to continue working with the same NPSG personnel involved in negotiating the Sale Agreement. Indeed, as plaintiffs contended at oral argument, Southern Source could have negotiated for an "essential personnel clause" in either the Sale Agreement or the TS Agreement, but it did not do so. Further, as plaintiffs noted at oral argument, even if Southern Source had a unilateral, unstated expectation that it could work out any issues with the same NPSG personnel involved in negotiating the Sale Agreement, that expectation was unreasonable. Everyone involved in the transaction knew that NPSG was going out of business. No rational jury could find that Southern Source had a reasonable expectation of being able to work with the same NPSG personnel who negotiated the Sale Agreement. As for the other four factors described in Restatement (Second) of Contracts § 241, they also do not support Southern Source's position. There is no genuine issue of material fact as to

whether the doctrine of first material breach applies, and Southern Source may not avert plaintiffs' motion for summary judgment on this basis.

B.

Southern Source next argues that plaintiffs' motion for summary judgment should be denied because there is a genuine dispute of material fact about whether NPSG personnel misrepresented the status of various price increases imposed on NPSG customers during the due diligence for the Sale Agreement. Plaintiffs respond that there were no misrepresentations. The crux of this dispute revolves around whether Southern Source is entitled to a "dollar for dollar" reduction of the $1.5 million payment for "Losses as defined in [Article] 13" of the Sale Agreement. See Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. A [D.E. 25-2], art. 3, ¶ B, p. 3. Southern Source argues that such "Losses" would include "Losses" arising out of NPSG's alleged misrepresentation of certain financial information referenced in Article 8, paragraph K of the Sale Agreement. See id. at art. 8, ¶ K, p.10; id. at art. 13, ¶ A, pp. 16–17. The alleged misrepresentations concern whether NPSG sales personnel had gotten NPSG customers to agree to higher prices in 2004 to account for increased production costs.

At this time, the court need not consider this dispute about the alleged misrepresentation because, even if NPSG personnel did misrepresent the status of the price increases, Southern Source must still justify its refusal to pay the deferred $1.5 million payment by proving its misrepresentation-related losses on a "dollar for dollar" basis. Accordingly, to avoid summary judgment for plaintiffs, Southern Source must point to competent evidence in the record from which a rational jury could find that Southern Source suffered misrepresentation-related losses that warrant a dollar-for-dollar offset to the $1.5 million.

At oral argument, Southern Source conceded that the only evidence in the record supporting

11

Case 5:06-cv-00114-D   Document 59   Filed 03/14/08   Page 11 of 14

its claim regarding the amount of its alleged misrepresentation-related losses is the testimony and report of Charles Mueller ("Mueller").[5] The parties dispute whether Southern Source offered Mueller as an expert or a lay witness, whether Mueller's "supplementation" of his report was timely under the court's scheduling order, and whether Mueller is competent to testify about Southern Source's alleged misrepresentation-related losses.

The court concludes that Southern Source purports to offer Mueller as an expert witness. At oral argument, Southern Source contended that, perhaps, it should not have identified Mueller as an expert witness, but rather submitted his report as a summary of voluminous writings under Federal Rule of Evidence 1006. The court rejects this argument. Southern Source admitted at oral argument that it identified Mueller as an expert witness in its discovery responses and produced Mueller's report under Federal Rule of Civil Procedure 26(a)(2). See also Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. Ex. D [D.E. 44-5]; Def.'s Am. Mem. in Opp'n to Pls.' Mot. for Summ. J. Ex. J [D.E. 51-12]. Further, plaintiffs deposed Mueller as an expert, and Southern Source thereafter supplemented Mueller's expert report. The court concludes that Southern Source offered Mueller as an expert witness, not as a lay witness presenting a summary of voluminous information under Federal Rule of Evidence 1006.

Turning to Mueller's report and testimony, plaintiffs' memoranda extensively attack Mueller's methodology and testimony. See Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. 12–22; Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. 3–8. Plaintiffs, however, have not filed a motion to exclude Mueller's report or testimony under Federal Rules of Civil Procedure 37 or 56(e), or under

---

[5] At oral argument, Southern Source suggested that the affidavit of David Hunt also provides evidence of damages. However, Hunt bases his affidavit testimony on the results of Mueller's report. See David Hunt Aff. 2 [D.E. 51-10]. Hunt's affidavit testimony is therefore inseparable from Mueller's report, and cannot provide competent evidence of damages without Mueller's report.

12

Federal Rules of Evidence 401 or 702. Accordingly, out of an abundance of caution, the court will deny plaintiffs' motion for summary judgment without prejudice. See, e.g., Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 188–89 (1st Cir. 1997) (court should generally receive briefing before excluding expert evidence as inadmissible). Nonetheless, the court has serious doubts about whether the Mueller report and testimony provide competent evidence of Southern Source's alleged misrepresentation-related losses. Indeed, the court notes that Mueller has repeatedly testified that he expresses no opinion on lost revenue. See Charles Mueller Dep. [D.E. 45-2], at 101:24–102:3 ("Q: I recognize you've told me before that the multiplier and lost revenue columns are not your work and you're not expressing an opinion one way or the other on those. Correct? A: That's correct."); id. at 57:7–57:14 ("I don't know — I don't know what a right number is. I just know that based on parameters that are given to me I'm to put things in a bucket."); id. at 6:17–6:19 ("I did not put in the multipliers or come up with lost revenue. I generated the sales within each bucket."). Further, the court notes that, without the Mueller report and testimony, there would be no competent evidence in the record from which a rational jury could conclude that Southern Source suffered any losses sufficient to offset its obligation to pay the $1.5 million. Cf. Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 303 (4th Cir. 1998) ("Defendants' motion to strike the affidavit and testimony of [plaintiff's expert] will be granted . . . because [the expert's] opinion testimony would not be admissible under [Fed. R. Evid.] 702 . . . . Without such evidence, plaintiffs have failed to raise a genuine issue of fact on an essential element of . . . their claims . . . ."); cf. also Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 757–61 (8th Cir. 2003) (affirming exclusion of evidence from damages expert).

In order to permit the parties to fully brief whether to exclude Mueller's report and testimony, the court will permit plaintiffs to move to exclude the Mueller report and testimony. See Fed. R.
13

Case 5:06-cv-00114-D   Document 59   Filed 03/14/08   Page 13 of 14

Civ. P. 37 & 56(e); Fed. R. Evid. 401 & 702; <u>Ruffin,</u> 149 F.3d at 296. Plaintiffs' motion also should address (1) whether the "supplementation" of the Mueller report was timely, and (2) whether either the original or the "supplemented" version of the Mueller report provides competent evidence of Southern Source's alleged misrepresentation-related losses. In plaintiffs' motion, plaintiffs also may renew their motion for summary judgment.

IV.

As explained above, defendant's objection to the M&R is overruled, the court adopts the M&R, and defendant's motion for summary judgment is DENIED. Additionally, plaintiffs' motion for summary judgment is DENIED without prejudice. Plaintiffs shall have until April 1, 2008, to submit a motion to exclude the Mueller report and testimony. As a part of that motion, plaintiffs also may renew their motion for summary judgment. Defendant's response and plaintiffs' reply are due in accordance with the Local Rules.

SO ORDERED. This 14 day of March 2008.

JAMES C. DEVER III
United States District Judge